**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

WALTER ANDREW KAUFMAN, JR.          CASE NO. 19-12904

      *Plaintiff,*                          HON. DENISE PAGE HOOD
*v.*                                            DISTRICT JUDGE

COMMISSIONER OF SOCIAL                HON. PATRICIA T. MORRIS
SECURITY,                                       MAGISTRATE JUDGE

      *Defendant.*
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF No. 10, 12)

## I.    RECOMMENDATION

Plaintiff Walter Andrew Kaufman, Jr. challenges Defendant Commissioner of Social Security's final decision that denied his claim for Title II Disability Insurance benefits ("DIB") and Title XVI Supplemental Security Income benefits ("SSI"). (ECF No. 1.) The case was referred to me for review. (ECF No. 3); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I recommend **DENYING** Plaintiff's Motion for Summary Judgment, (ECF No. 10), **GRANTING** the Commissioner's Motion, (ECF No. 12), and **AFFIRMING** the Commissioner's final decision.

## II.    REPORT

### A.    Introduction and Procedural History

Plaintiff's application for DIB was filed on April 25, 2018 (ECF No. 8-5,

PageID.199), and his application for SSI was filed on May 14, 2018. (*Id.*, PageID.206.) He alleges that the onset date of his disability was October 27, 2017. (*Id.*, PageID.199, 206.) The Commissioner denied the claims. (ECF No. 8-4, PageID.126, 134.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred on March 11, 2019. (ECF No. 8-2, PageID.77–101.) The ALJ issued a decision on April 9, 2019, finding that Plaintiff was not disabled. (*Id.*, PageID.64–72.) The Appeals Council denied review on August 5, 2019. (*Id.*, PageID.42.) Plaintiff sought judicial review on October 4, 2019. (ECF No. 1.) The parties have filed cross-motions for summary judgment and briefing is complete. (ECF No. 10, 12–13.)

### B.    Standard of Review

The court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See*

*Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286. (internal citations omitted).

### C.     Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or] her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 8-2, PageID.71.) At step one, the ALJ found the Plaintiff met the insured status requirements through June 30, 2021. (*Id.*, PageID.66.) Plaintiff had not engaged in substantial gainful activity since October 27, 2017, the alleged onset date. (*Id.*)

At step two, the ALJ concluded that Plaintiff's severe impairment was degenerative disc disease. (*Id.*) These impairments did not meet or medically equal a listed impairment in step three. (*Id.*, PageID.67.) Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform

> sedentary work as defined by 20 CFR 404.1567(a) and 416.967(a) with the following additional limitations: ability to alternate between sitting and standing at ten minute intervals; no climbing of stairs or ladders; occasional balancing, stooping, and crouching; no kneeling, or crawling; frequent handing and fingering; and simple tasks with only brief, superficial contact with others.

(*Id.*) At step four, the ALJ found that Plaintiff could not perform past relevant work. (*Id.*, PageID.70.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the economy, which included assembler, inspector, and product processing. (*Id.*, PageID.71.) Accordingly, Plaintiff was found to be not disabled. (*Id.*)

### E.   Administrative Record

#### 1.   Overview of Medical Evidence

In October 2017, Plaintiff was involved in a motor vehicle accident. (ECF No. 8-9, PageID.509.) Plaintiff was riding a bicycle when he was side swiped by a car, and he fell off his bike. (*Id.*) Plaintiff presented at Beaumont Health within two days, complaining of upper back, neck, and left wrist/hand pain. (*Id.*) A physical exam revealed no back tenderness, mild left wrist tenderness, and normal motor and sensory function. (*Id.*, PageID.511.) A final impression of Plaintiff included sprains of the cervical paraspinal back, right thoracic paraspinal back, right trapezius, and left wrist/hand. (*Id.*, PageID.512.)

Plaintiff also met with Dr. Mumtaz George for an office visit. (ECF No. 8-7, PageID.329–31.) Dr. George's diagnosis was pain in the left hand and wrist and knee, pain in the thoracic spine and low back, and cervicalgia. (*Id.*, PageID.331.) Plaintiff was advised to go to physical therapy. (*Id.*) Also, an x-ray of Plaintiff's right knee showed a tear of the medial meniscus with effusion present. (*Id.*, PageID.348.) The lateral meniscus, ACL, PCL, LCL, and MCL were intact. (*Id.*)

In November 2017, Plaintiff was evaluated for physical therapy by Dr. William Gonte. (ECF No. 8-9, PageID.664–65.) Plaintiff complained of occasional radicular symptoms in his left arm, and pain in his neck, lower back, and left wrist (each rated 9/10 for pain). (*Id.*, PageID.664.) Dr. Gonte's assessment of Plaintiff was that Plaintiff "comes to physical therapy . . . with severe mechanical dysfunction of the cervical spine, lumbar spine, and left wrist. [Plaintiff] will benefit from physical therapy to reduce pain, increase strength and ROM." (*Id.*) Dr. Gonte also signed an ADA form for reasonable accommodation for Plaintiff's employer. (*Id.*, PageID.670–71.) Dr. Gonte indicated that Plaintiff could not perform the essential functions of his position for 1–3 months, that Plaintiff could not work, and that he has "spinal injuries which require treatment with the goal of returning to work." (*Id.*) In December 2017, Dr. Gonte said Plaintiff was "progressing well with physical therapy", but he still has "quite a bit of symptomatology". (*Id.*, PageID.674.)

In January 2018, Plaintiff underwent a lumbar spine MRI. (ECF No. 8-9, PageID.726–27.) The impression following the MRI was:

> L5-S1 disc desiccation, central and right disc protrusion. Effacement of the thecal sac. Effacement of the right S1 root within the right lateral recess. Abutment of the left S1 root within the left lateral recess. Mild central canal stenosis.
>
> L4-5 disc desiccation, broad disc protrusion, annular rent. Mild to moderate central canal stenosis. L5 root effacement in the lateral recesses.

(*Id.*, PageID.727.) Plaintiff also underwent a cervical spine MRI. (*Id.*, PageID.728–29.)

The impression following this MRI was:

> C5-6 bilobed disc protrusion asymmetric to the left. Effacement of the left hemicord. Left greater than right foraminal stenosis with left C6 root effacement.
>
> C6-7 central left disc protrusion. Effacement of the left hemicord. Foraminal stenosis with C7 root abutment.
>
> C4-5 broad disc protrusion asymmetric to the right. Mild to moderate right foraminal stenosis.
>
> No spinal cord gliosis or syrinx formation.

(*Id.*, PageID.729.) Finally, an MRI of the right knee showed a tear in the medial meniscus; intact lateral meniscus; chronic MCL sprain with intact ligaments; minimal knee joint effusion; and no bone contusion, fracture, or chondral effects. (*Id.*, PageID.730.) A consulting radiologist's impression of the MRI was "Partial ossification of medial collateral ligament otherwise essentially negative." (ECF No. 8-7, PageID.352.)

Following the MRIs, and also in January 2018, Dr. George diagnosed Plaintiff with pain in right knee, cervicalgia, and low back pain. (ECF No. 8-7, PageID.321.) Plaintiff's musculoskeletal system was described as grossly normal. (*Id.*) In addition, at an appointment with Dr. Nicholas Dutcheshen, Plaintiff's condition was described as "symptoms are worse with activity", "He walks with a normal gait", and "[He] has no

walking limitation." (*Id.*, PageID.383.) Plaintiff and Dr. Dutcheshen discussed proceeding with a right knee scope operation. (*Id.*, PageID.384.)

Plaintiff met with Dr. Ronald Lederman in February 2018. (*Id.*, PageID.445–48.) Plaintiff expressed he is not happy progress of conservative treatment, e.g. physical therapy, and he wanted to proceed with surgery for his right knee. (*Id.*, PageID.447.) Examination at this time showed Plaintiff with normal reflexes and distal sensation, right muscle tests at 4 or 5/5, and limited range of motion in his right knee. (*Id.*, PageID.446– 47.) Plaintiff had no effusion, but he had atrophy at the quadriceps femoris. (*Id.*, PageID.446.) Plaintiff walked with a limp. (*Id.*)

Plaintiff underwent surgery on his right knee, arthroscopic synovectomy, in March 2018 by Dr. Lederman. (*Id.*, PageID.443–44.) Plaintiff tolerated the procedure well, with the only residual effects expected to be further patellofemoral issues. (*Id.*, PageID.444.) Dr. Lederman did not anticipate any significant issues with the small medial and lateral meniscal tears that were found. (*Id.*)

Plaintiff was referred to Dr. Michael Kapsokavathis for a spinal evaluation, in March 2018. (ECF No. 8-7, PageID.390.) Plaintiff continued to describe pain in his neck (rated 8/10), his shoulder blade (rated 6/10), and his lumbar spinal area (rated 2 or 3/10). (*Id.*) He described physical therapy as "somewhat helpful" for only brief periods of time. (*Id.*) Dr. Kapsokavathis' findings here included positive Spurling's test on left, flexion is full, extension is dramatically limited, and left foot rotation decreased about 30% to 40%. (*Id.*, PageID.391.) Further findings included decreased range of motion of lumbar spine by

about 20%, 2+/4 reflexes throughout the bilateral upper and lower extremities, sensation was intact to pinwheel, and good muscle strength without any lateralizing weakness. (*Id.*)

Plaintiff went for an independent orthopedic evaluation with Dr. Terry Weingarden. (ECF No. 8-7, PageID.394–99.) Physical examination showed no pain on palpation of the cervical muscles. (*Id.*, PageID.396.) Plaintiff had full range of motion of his head and neck, and a negative Spurling's test. (*Id.*) Plaintiff's left wrist had full range of motion with no pain noted. (*Id.*) Plaintiff's low back had no pain on palpation of the lumbar muscle. (*Id.*, PageID.397.) Plaintiff's straight leg raise test was negative, and he had normal sensation to pinpoint in the lower extremities. (*Id.*) Dr. Weingarden concluded that there were no signs of cervical or lumbar compressive radiculopathy or signs of lumbar muscle spasm. (*Id.*, PageID.398.) Plaintiff's left wrist was within normal limits. (*Id.*) Dr. Weingarden's prognosis of Plaintiff was excellent, and Weingarden feels that Plaintiff is able to return to work as a cook. (*Id.*) Plaintiff was not taking any medications, and Weingarden feels Plaintiff is capable of doing activities of daily living. (*Id.*, PageID.399.)

Also, in March 2018, Plaintiff met Dr. Collin O'Keefe and complained of lumbar and cervical spine pain. (*Id.*, PageID.435.) Dr. O'Keefe's stated plan included comments that "[Plaintiff] had no red flags" and "His neurologic testing was essentially normal." (*Id.*, PageID.438.) Dr. O'Keefe recommended Plaintiff restart physical therapy and consider epidural steroid injections. (*Id.*) Here, Plaintiff's muscle testing in the physical examination showed 5/5 on the left and right for his quadriceps, knee extensor and flexion, great toe and ankle and plantar dorsiflexion. (*Id.*, PageID.437.) Plaintiff's Achilles reflex was 1/4 on the left and right side. (*Id.*) Sensation was intact bilaterally on the lower leg. (*Id.*) Sensation

was intact bilaterally on the neck. (*Id.*) Spurling's test was negative on right, with cervical pain on left. (*Id.*) For Plaintiff's muscle testing at the cervical spine exam, Plaintiff's biceps and triceps reflex was 2/4 on left and right, and the biceps, triceps, deltoid, and wrist (left and right) were at 5/5. (*Id.*, PageID.436.)

In April 2018, Plaintiff met Dr. Lederman about his complaint of pain in the left wrist and hand. (*Id.*, PageID.426.) A complete ultrasound examination of the left wrist "fail[ed] to reveal any obvious abnormality of the bones, joints or tendons." (*Id.*, PageID.429.) A short arm cast was to be prepared for Plaintiff's condition with his left wrist and hand. (*Id.*)

In June 2018, an EMG revealed that "There is electrophysical evidence of a bilateral L5 and S1 radiculopathy." (ECF No. 8-8, PageID.497.)

Plaintiff underwent arthroplasty of the C5-6 vertebrae in July 2018. (ECF No. 8-9, PageID.637–62.) Later, in August, Plaintiff's physical exam revealed "AP and lateral cervical spine films show the arthroplasty in good position and functioning well." (ECF No. 8-7, PageID.468.) Plaintiff also had "spontaneous full range of motion without contracture." (*Id.*, PageID.471.) His upper and lower extremities muscle groups were 5/5 in strength, and his deep tendon reflexes were +2/4 bilaterally in biceps, triceps, brachioradialis, patellar, and Achilles. (*Id.*, PageID.472.)

In September 2018, had a post-operation visit with Dr. Fernando Diaz. (*Id.*, PageID.460–63.) Plaintiff had considerable residual muscle spasm, and he believed that his discectomy should be converted to cervical fusion. (*Id.*, PageID.462.) Dr. Diaz recommended physical therapy treatment before discussing additional surgical options.

(*Id.*) On examination, here, Plaintiff's lower and upper extremity strength was 5/5 bilaterally in all muscle groups. (*Id.*) He had decreased range of motion in the cervical spine, and he had positive foraminal compression signs and severe paravertebral muscle spasm. (*Id.*)

As a part of Plaintiff's application for DIB/SSI, Plaintiff was evaluated by Dr. Marshall Spencer. (ECF No. 8-3, PageID.103–20.) Plaintiff was found to have non-severe degenerative disc disease and non-severe dysfunction of major joints. (*Id.*, PageID.109.) Plaintiff's symptoms included pain and weakness. (*Id.*) Dr. Spencer's assessment was that Plaintiff's symptoms were partially consistent with the medical and non-medical record evidence. (*Id.*, PageID.110.) "Overall [Plaintiff's] [medically determinable impairments] could cause his reported pain but it is not durationally limiting and therefore nonsevere." (*Id.*) Plaintiff was found to be not disabled. (*Id.*, PageID.111.) The Doctor commented further that "Your condition does not result in significant limitations in your ability to perform basic work activities. We have determined that your condition is not severe enough to be considered disabling." (*Id.*)

### 2.    Application Reports and Administrative Hearings

#### a.    Function Report

Plaintiff completed a function report on May 31, 2018 for his application for DIB/SSI. (ECF No. 8-6, PageID.253.) Plaintiff stated that his conditions limit his ability to work, in that his degenerative disc disease limits his bending and lifting, and his ruptured discs limit most physical activities and create pain and stiffness. (*Id.*, PageID.246.) He felt dizzy, shooting and throbbing pain, and his left wrist hurts. (*Id.*)

Plaintiff's daily activities, from waking up to going to bed, were waking up, going to medical appointments, and physical therapy. (*Id.*, PageID.247.) Plaintiff provides care for a minor child; for the child, Plaintiff cooks, does laundry, and picks up or drops off the child from or to Plaintiff's ex-wife. (*Id.*) He does not provide care for any animals. (*Id.*) Before his current conditions, Plaintiff could do everything: physical activity, sports, tending to his child. (*Id.*) Plaintiff's neck aches when resting and his knee hurts, and these conditions affect his sleep. (*Id.*) Plaintiffs overall conditions do not affect his personal-care abilities, such as dressing, bathing, shaving, feeding himself, and using the toilet. (*Id.*) Plaintiff does not need reminders for his personal care needs, and he does not need reminders for taking medication. (*Id.*, PageID.248.) Plaintiff can prepare light meals, microwave frozen meals, and prepare oven-made meals. (*Id.*) He does not need help or encouragement to do these things. (*Id.*) Plaintiff does not do house or yard work because of pain. (*Id.*, PageID.249.) Plaintiff goes outside for medical appointments and picking up his child. (*Id.*) When going out, Plaintiff can walk, ride in a car, or use public transportation. (*Id.*) He does not drive because he does not have a car, and his neck hurts to move in certain positions. (*Id.*) Plaintiff can shop for food in stores, and that can take less than 30 minutes. (*Id.*) Plaintiff can pay bills, count change, handle a savings account, and use a checkbook or money orders. (*Id.*) Plaintiff's hobbies include martial arts, modifying cars, and BMX bike stunts, but he says he cannot do these things anymore. (*Id.*, PageID.250.) He says he sleeps more, he cannot work out as much, and it is hard to walk long for long periods of time. (*Id.*) Plaintiff will spend time with others by being on the phone, for about two to six times per week. (*Id.*) He needs reminders to go to appointments for to his doctors. (*Id.*) He

does not have problems getting along with family, friends, or neighbors. (*Id.*, PageID.251.) His social activities have changed with his condition; he does not go out with friends much due to pain. (*Id.*)

Plaintiff says that his condition affects his ability to lift, squat, bend, reach, walk, and kneel. (*Id.*) Plaintiff can walk for about a mile, and then rest for 10–30 minutes. (*Id.*) He does not use a cane. (*Id.*, PageID.252.) He can pay attention through a whole conversation, he can finish what he starts, and he can follow written and spoken instructions. (*Id.*, PageID.251.) He has not been fired from a job for problems getting along with people. (*Id.*, PageID.252.) He can handle stress and changes in routine well. (*Id.*) But he thinks he is more irritable. (*Id.*)

Plaintiff is not currently taking any medications for his conditions. (*Id.*, PageID.253.)

Plaintiff further stated his "Right knee hurts even after surgery." (*Id.*) He has "Plantar fascia pain in right foot." (*Id.*) And his "Left wrist hurts when grabbing a cup and turning wrist." (*Id.*)

### b.      Plaintiff's Testimony at the Administrative Hearing

At the time of the hearing, on March 11, 2019, Plaintiff was living with his grandfather, and before then he was homeless. (ECF No. 8-2, PageID.80–81.)

Plaintiff explained he could not work because he has "significant nerve damage in [his] arms and legs. . . . It is hard for [him] to move [his] arms." (*Id.*, PageID.80.) He said he had surgery for disc replacement, to help with nerve pain, but he said the pain became worse in the last six months. (*Id.*) He described any type of arm movement is hard and

lifting at least two pounds leads him to experience nerve or tingling pain. (*Id.*, PageID.81–82.) Plaintiff explained that when he stands up straight, he experiences radiating pain because of sciatic nerves in the right and left legs. (*Id.*, PageID.82.) He has pain in his lumbar back, his neck, under his shoulder blades, and his right knee, and there is some variance in pain where some days are more tolerable than others. (*Id.*, PageID.87, 90.) He experiences really bad days three to four days of the week. (*Id.*, PageID.88.) He has difficulty sleeping because of sciatic pain. (*Id.*, PageID.83) He regularly naps during the day, for minutes or hours, because he can only sleep at night for about four hours. (*Id.*, PageID.91.)

Plaintiff, in the past, was a mechanic, and he had an engineering job at Chrysler. (*Id.*, PageID.85.) Before this, he worked at TRW, doing automotive work and testing brake components. (*Id.*, PageID.86.) Before that, he had acting work. (*Id.*) He has a degree in automotive, applied science for automotive technology. (*Id.*, PageID.85)

Plaintiff said he needs to sit down or take a different position every couple of minutes, but this can vary. (*Id.*, PageID.83. *See also id.*, PageID.89.) On his best day, he can stand for five to ten minutes. (*Id.*) He also can walk for about three to four blocks before needing to stop. (*Id.*, PageID.89.) Plaintiff has difficulty with activities such as opening jars, writing, or buttoning things. (*Id.*, PageID.84.) He would have difficulty holding a cell phone or typing. (*Id.*, PageID.93.) Pain and other symptoms make it difficult to focus or concentrate, and he said that would make it difficult to work. (*Id.*, PageID.88, 91.)

Plaintiff has received injections and physical therapy for his pain, but the relief was temporary and the "severe pain" returns or persists. (*Id.*, PageID.86.) He was prescribed medication, but he was not taking them. (*Id.*, PageID.83.) And he was working on trying to see someone for counseling; he said that he was experiencing anxiety and stress. (*Id.*, PageID.84.) Plaintiff was scheduled for neck fusion surgery in March. (*Id.*, PageID.82.)

Plaintiff says that he does not drink alcohol, he does not take unprescribed drugs, and he did not have a past problem with opiates. (*Id.*, PageID.83–84.)

Plaintiff was 36 years old; 6 feet, 1 inch tall; and he weighed 244 pounds. (*Id.*, PageID.80.) He has two Associate's degrees. (*Id.*)

### c.   The Vocational Expert's ("VE") Testimony at the Administrative Hearing

The VE identified Plaintiff's past relevant work, according to the *Dictionary of Occupational Titles* ("*DOT*"), as mechanical engineering technician. (*Id.*, PageID.94.) The ALJ inquired of the VE, if the past work was available for an "individual of [Plaintiff's] age, education, past work experience as a light exertional limitation, frequent stairs, occasional ladders, frequent postural limitations, [and] capable of simple tasks on sustained basis." (*Id.*, PageID.95–96.) The VE responded, "No." (*Id.*, PageID.96.) The VE also indicated past work would be available if the individual was not limited to simple tasks. (*Id.*) Returning to the earlier limits with the limit of simple tasks, the VE identified available jobs as housekeeping, *DOT* 323.687-017 (150,000 jobs nationally); assembler, *DOT* 729.684-054 (100,000 jobs nationally); and machine tender, *DOT* 556.685-038 (100,000 jobs nationally). (*Id.*)

Working from the first hypothetical, the ALJ inquired about those jobs if "we add a sit and stand option at ten minute intervals, no stairs or ladders at the work site, occasional balance, stoop, crouch, no kneeling, no crawling, frequent handling and fingering with the upper extremities, capable of simple tasks with only brief superficial contact with others . . . [.]" (*Id.*) Of the previously identified jobs, only the assembler would remain at 30,000 jobs nationally. (*Id.*, PageID.96–97.) And the VE identified additional work within the new limitations: packaging work, *DOT* 559.687-074 (24,000 jobs nationally); visual inspection work, *DOT* 741.687-010 (number of jobs were not identified); and product processing, *DOT* 709.687-010 (25,000 jobs nationally). (*Id.*, PageID.97.)

The ALJ then inquired about what jobs were available at the sedentary level. (*Id.*) The VE replied with: assembly work, *DOT* 706.684-030 (30,000 jobs nationally); visual inspection work, *DOT* 669.687-014 (10,000 jobs nationally); product processing, *DOT* 559.687-014 (25,000 jobs nationally). (*Id.*, PageID.97–98.)

The ALJ then inquired about light exertional work, with occasional handling and fingering. (*Id.*, PageID.98.) The VE said that those limits would eliminate all work. (*Id.*) The ALJ then inquired about sedentary work, and the VE identified entry level work in security fields (e.g. lobby attendant, gate attendant, and security monitor), *DOT* 379.367-010 (25,000 jobs nationally). (*Id.*)

The ALJ inquired about the individual being consistently off task, 20% of the workday, or needing one hour of additional break time daily, and would miss two or more days a month. (*Id.*) The VE said those factors "would remove a person from competitive employment." (*Id.*, PageID.98–99.)

The VE stated his "testimony is based on 39 years of rehabilitation counseling and practice, based on experience with hundreds of persons with disabilities. I rely on the *DOT*, I relied on companion publications, I relied on both federal and proprietary sources of the labor market information." (*Id.*, PageID.99.)

**F.    Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)    Licensed physician (medical or osteopathic doctor);

(2)    Licensed Psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)    Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)    Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)    Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-

language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)     Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.*, § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.*, § 404.1502(e). "This includes, but is not limited to: (1) You; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings,

18

including those from your medical sources." *Id.*, § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.*, § 404.1520c(c)(3). This factor will include the analysis of:

(i)     Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)   Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)   Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.*, § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.*, § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.*, § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.*, § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the

factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.*, § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.*, § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.*, § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

     (ii)     Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

     (iii)    Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

     (iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

     (v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

     (vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.*, § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.*, § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.*, § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable

clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*, § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.*, § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.*, § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and

24

persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.*, § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.*, § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*, § 404.1529(c)(3).

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the

objective medical evidence and other evidence, will be taken into account…We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

    (i)      [D]aily activities;

    (ii)     The location, duration, frequency, and intensity of . . . pain;

    (iii)    Precipitating and aggravating factors;

    (iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

    (v)     Treatment, other than medication, . . . received for relief of . . . pain;

    (vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.*, § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.*, § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

    (1)     The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)     The treatment involves amputation of an extremity, or major part of an extremity.

*Id.*, § 404.1530(c).

### G.     Arguments and Analysis

#### 1.     Substantial evidence supports the ALJ finding that Plaintiff's conditions do not meet or medically equal Listing 1.04(A).

Plaintiff argues that his conditions meet or medically equal Listing 1.04(A): disorders of the spine, thus Plaintiff should be found disabled. Plaintiff is incorrect.

At step three of the five-step sequential evaluation to determine Plaintiff's disability status, the ALJ must determine if Plaintiff's impairments meet or medically equal a listing section. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

Plaintiff first asserts that the ALJ did not properly evaluate the medical record. At step three, the ALJ stated[1]:

---

[1] *See Biehl v. Comm'r of Soc. Sec.*, 2015 WL 736366 at *15 (E.D. Mich. 2015) ("the Sixth Circuit has consistently rejected a heightened articulation standard, noting . . . that the ALJ is under no obligation to

> Although [Plaintiff] has "severe" impairments, they do not meet the criteria of any listed impairments . . . .
>
> No treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment of the Listing of Impairments.
>
> The undersigned has paid specific attention to [Listing 1.04]. . . . There is no evidence of neuro-anatomic distribution of pain, limitation of motion of the lower back, motor loss accompanied by sensory or reflex loss, or positive straight leg raising in both sitting and supine positions so as to meet the criteria of Listing 1.04.

(ECF No. 8-2, PageID.67.) Next, the ALJ considered at length the whole record evidence, and the weight given to each individual record, in determining Plaintiff's residual functional capacity. Here, the Court relies on the persuasive direction found in *Schoolfield v. Barnhart*, 220 F. Supp. 2d 512 (D. MD. 2002), where it stated that remand is appropriate for a clear explanation of medical evidence in support of the conclusion reached

> *except in those circumstances where it is clear from the record* which listing or listings in the [Listing of Impairments] were considered, and *there is elsewhere in the ALJ's opinion an equivalent discussion* of the medical evidence relevant to the Step Three analysis which allows this Court readily to determine whether there was substantial evidence to support the ALJ's Step Three conclusion.

*Schoolfield*, at 522. (Emphasis added.) Here, the Court finds that the ALJ properly evaluated the medical records at step three based on an equivalent discussion of the evidence in the determination of Plaintiff's residual functional capacity. And even if these reasons are insufficient for step three, as discussed below, Plaintiff "has not shown that his impairments met or medically equaled in severity any listed impairment[.]" and thus any

---

spell out every consideration that went into the step three determination or the weight he gave each factor in his step three analysis, or to discuss every single impairment.") (internal quotation marks omitted).

purported error is harmless. *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2012); *see also Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011).

Plaintiff argues that his condition meets Listing 1.04(A), disorders of the spine. The relevant text of this section is as follows:

> 1.04   *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . .

20 C.F.R. Pt. 404, Subpt. P., App. 1[2]. (Quotation format condensed.)

Plaintiff cites the January 2018 MRI (ECF No. 8-7, PageID.410) of his cervical spine for evidence of spinal stenosis resulting in compromise of a nerve root. Additionally, Plaintiff also cites Dr. Kapsokavathis' March 2018 clinical summary, where the Doctor stated "[Plaintiff's] lumbar symptoms have receded somewhat; [Plaintiff] has significant positive nerve compression on his lumbar scan. His cervical symptoms have not regressed; he has significant cord compression and nerve root compression on MRI findings." (*Id.*, PageID.392.) However, this alone does not describe the severity of Plaintiff's condition, nor does it suggest what limitations Dr. Kapsokavathis would place on Plaintiff. Here, "the

---

[2] By the terms of 20 C.F.R. Pt. 404, Subpt. P., App. 1, there is an effective end date of January 27, 2020 for 1.00 Musculoskeletal System. However, the effective end date was extended to February 4, 2022 via final administrative rule. Extension of Expiration Dates for Five Body System Listings, 84 Fed. Reg. 64,993 (Nov. 26, 2019) (to be codified 20 C.F.R. Pt. 404).

Sixth Circuit has 'regularly found substantial evidence to support a finding of no severe impairment' despite evidence of the plaintiff's symptoms and diagnosis of a disorder, where that evidence failed to describe a disabling impairment." *Bailey v. Comm'r of Soc. Sec.*, 2018 WL 2440357, at *2 (E.D. Mich. 2018) (quoting *Long v. Apfel*, 1 F. App'x 326, 331–32 (6th Cir. 2001) (citing cases))[3]. Assuming arguendo that Plaintiff is implicitly considering these factors severe or limiting: first, contrary to Plaintiff's assertion, Dr. Kapsokavathis described Plaintiff as "not myelopathic"[4] (ECF No. 8-7, PageID.392); second, there is no cited authority for finding implied limitations. *See Bailey*, at *2.

Plaintiff next argues that he experienced radiculopathy, radiating pain, and he had positive Spurling's tests; and thus, he had nerve root compression characterized by neuro-anatomic distribution of pain. Here, the ALJ found, and the "[o]bjective evidence supports degenerative conditions of the cervical and lumbar spine with radiculopathy." (ECF No. 8-2, PageID.69. Citing ECF No. 8-7, PageID.389–457; ECF No. 8-8, PageID.491.)

---

[3] While the condition in *Bailey* was not a reference to a listed impairment, it "is generally important", for the evaluation of impairments of the musculoskeletal system, for a longitudinal record for "assessment of *severity* and *expected duration* of an impairment unless the claim can be decided favorably on the basis of current evidence." 20 C.F.R. Pt. 404, Subpt. P., App. 1 § 1.00 (H) (emphasis added). The *Bailey* framework provides guidance for reviewing medical records for severity and expected duration of conditions. Further, this is consistent with regulations of reviewing symptoms of listed impairments, where

> Generally, when a symptom is one of the criteria in a listing, it is only necessary that the symptom be present in combination with the other criteria. It is not necessary, *unless the listing specifically states otherwise*, to provide information about the intensity, persistence, or limiting effects of the symptom as long as all other findings required by the specific listing are present.

20 CFR §404.1529(d)(2) (emphasis added.)

[4] "Myelopathy is an injury to the spinal cord due to *severe* compression that may result from trauma, congenital stenosis, degenerative disease or disc herniation." Myelopathy. https://www.hopkinsmedicine.org/health/conditions-and-diseases/myelopathy (last visited August 18, 2020) (emphasis added).

Similarly, the ALJ cited record evidence of "decreased range of motion" in the cervical and lumbar spine. (*Id.* Citing ECF No. 8-7, PageID.472.)

Plaintiff finally argues that he experienced motor loss accompanied with sensory or reflex loss. Here Plaintiff is incorrect. Substantial evidence supports a finding that there is no motor loss or sensory loss. There are numerous instances in the record where Plaintiff's examination regularly revealed either no loss or loss that was limited.[5] This Court previously articulated that muscle strength at 4/5 is "a good to normal grade" "in some areas" and—without more demonstration of how the particular evidence supports Plaintiff—is insufficient to support the muscle weakness–motor loss requirement of Listing 1.04(A). *Wilkinson v. Comm'r of Soc. Sec.,* 2019 WL 7838630, at *19 (E.D. Mich. 2019), *rep. & rec. adopted*, 2020 WL 358713 (E.D. Mich. 2020). *See also Harrision v. Comm'r of Soc. Sec.,* 2019 WL 4463307, at *8. (E.D. Mich. 2019), *rep. & rec. adopted*, 2019 WL 4450983 (E.D. Mich. 2019). In addition, Plaintiff does not show motor loss for a 12-month period, or that motor loss is expected to last 12 months, and this durational requirement is also fatal to Plaintiff's claim. 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 1.00(B)(2); *See also* Acquiescence Ruling 15-1(4), 80 Fed. Reg. 57,418 (Sept. 23, 2015); *Harrision*, supra.

---

[5] A test of Plaintiff's cervical spine muscle strength showed 3+/5 in November 2017 (ECF No. 8-9, PageID.664); 4-/5 in December 2017 (*Id.*, PageID.672); 4+/5 in January 2018 (*Id.*, PageID.678); 4+/5 in February 2018 (*Id.*, PageID.682). In March 2018, Plaintiff had "2+/4 reflexes throughout the bilateral upper and lower extremities. Sensation was intact to pinwheel. Good muscle strength without any lateralizing weakness." (ECF No. 8-7, PageID.391.) Plaintiff, in cervical spinal exams, showed 5/5 strength in various muscles in November 2017 (ECF No. 8-9, PageID.669), March 2018 (ECF No. 8-7, PageID.436), April 2018 (*Id.*, PageID.427), May 2018 (*Id.*, PageID.476), July 2018 (*Id.*, PageID.487), September 2018 (*Id.*, PageID.462.). Dr. Kapsokavathis, in July 2018, said "It is good to see that [Plaintiff] is not generating weakness or numbness . . . ." (*Id.*, PageID.482.) Plaintiff's cervical stabilizers were 4-/5 in May 2018 (ECF No. 8-9, PageID.685); 4-/5 in June 2018 (*Id.*, PageID.692); 4-/5 in July 2018 (*Id.*, PageID.695); and 4/5 in November 2018. (*Id.*, PageID.711.)

Accordingly, in light of the discussion above, as Plaintiff cannot show that substantial evidence does not support the ALJ's finding that Plaintiff's condition does not meet or equal as Listing 1.04(A), Plaintiff was appropriately found to be not disabled at step three.

**2.      Substantial evidence supports the ALJ's RFC determination.**

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence. Specifically, Plaintiff claims the RFC was "fashioned out of whole cloth" because a "determination must be supported by at least one medical opinion where the record reveals objectively marked evidence of disability", and further that the determination, here, is not so supported. (Pl. Br., ECF No. 10, PageID.756.) Plaintiff is incorrect.

Plaintiff has to prove that his he is disabled. 20 CFR §§ 404.1512, 416.912. Plaintiff is "responsible for providing the evidence [the Social Security Administration] will use to make a finding about your residual functional capacity." 20 CFR §§ 404.1545, 416.945. Eventually, this evidence must be submitted to the ALJ. 20 CFR §§ 404.935, 416.1435. "[T]he ALJ is charged with the responsibility of evaluating the medical evidence and the [Plaintiff's] testimony to form an assessment of [his] residual functional capacity." *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (internal quotation marks omitted). In this case, the ALJ rendered a decision that Plaintiff was not disabled. (ECF No. 8-2, PageID.64–72.)

The ALJ considered evidence of the whole record, and specifically the medical opinions of Drs. Weingarden, Gonte, Diaz, and Spencer. (*Id.*) In March 2018, Dr.

Weingarden opined that Plaintiff could return to work[6]. (*Id.*, PageID.68, citing ECF No. 8-7, PageID.398.) In November 2017, Dr. Gonte said Plaintiff could not work, but there was a goal of returning him to work. (ECF No. 8-9, PageID.671.) Further, Dr. Gonte provided disability certificates for replacement services that indicated Plaintiff was disabled for successively longer time periods, through November 2018. (ECF No. 8-2, PageID.69, citing ECF No.8-9, PageID.676, 681, 684, 690, 697, 704.) However, none of these records, alone, describe the nature or the severity of Plaintiff's condition. Later, in November 2018, Dr. Gonte noted Plaintiff's complaints worsening for his conditions since the last month, but Dr. Gonte recommended Plaintiff join a health club and continue with physical and occupational therapy.[7] (*Id.*, PageID.706.) Similar to Dr. Gonte, Dr. Diaz recorded that Plaintiff could not return to work until November 2018. (ECF No. 8-2, PageID.69, citing ECF No 8-7, PageID.458.) But Dr. Diaz never indicated that Plaintiff could never return to work; rather, the plan was to continue adjusting to treatment following back surgery. (ECF No. 8-7, PageID.462.) Dr. Spencer, the DDS doctor, did not find Plaintiff's condition to be severe and did not list any limits on Plaintiff's RFC. (ECF No. 8-3, PageID.118–19.)

---

[6] Plaintiff states that Dr. Weingarden's opinion was "thoroughly torched" by a statement from Dr. Kapsokavathis. (Pl. Br., ECF No. 10, PageID.758. Citing ECF No. 8-7, PageID.482.) However—despite the critical statement—Dr. Kapsokavathis does not appear to indicate that Plaintiff's condition is disabling. Dr. Kapsokavathis said Plaintiff was a good candidate for neck surgery, recommended that Plaintiff continue percutaneous lumbar spine treatments, and recommended semi-regular evaluations because of disc herniations. (ECF No. 8-7, PageID.482.)

[7] A physical therapy record at this time also indicated Plaintiff's progress in returning to tolerable pain and performing activities which were previously listed as functional limitations. (ECF No. 8-9, PageID.712.)

Clearly, the ALJ relied on the medical evidence, and the consistency and supportability of that evidence, and articulated the persuasive weight given to each. (ECF No. 8-2, PageID.68–70. *See also* 20 CFR §§ 404.1520c, 416.920c.) In summary, two Doctors rendered opinions that durationally limited Plaintiff's disability, and two Doctors believed that Plaintiff could return to work. Plaintiff points to no evidence that shows the ALJ rejected any opinion that said that Plaintiff was disabled without duration.

The RFC is "the most [the Plaintiff] can still do despite [his] limitations [, and it is] based on all the relevant evidence in [Plaintiff's] case record." 20 CFR §§ 404.1545, 416.945. Now, in terms of the determined RFC here, there is no "bright line rule requiring the ALJ to base his or her RFC finding on a physician's opinion." *Gross v. Comm'r of Soc. Sec.*, 247 F. Supp. 3d 824, 829 (E.D. Mich. 2017). If a rule were to require that, it "'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.' This argument is rejected." *Rudd v. Comm'r of Soc. Sec.*, 531 Fed. App'x 719, 728 (6th Cir. 2013) (citation omitted). However, a "Court 'may not uphold an ALJ's decision, even if there is enough evidence in the record to support it, if the decision fails to provide an accurate and logical bridge between the evidence and the result.'" *Gross*, 247 F. Supp. 3d at 829 (quoting *Pollacia v. Comm'r of Soc. Sec.*, 2011 WL 281044, at *6 (E.D. Mich. 2011)).

In the instant case, the ALJ provided such logical bridge. The ALJ stated

> As to the [Plaintiff's] condition as a whole, he is found to retain the capacity to perform a limited range of sedentary work that allows the ability to alternate between sitting and standing at ten minute intervals. Objective evidence supports degenerative conditions of the cervical and lumbar spine with radiculopathy. The [Plaintiff] required physical therapy and surgical intervention. However, physical examinations have not shown debilitating limitations. The [Plaintiff] has not required emergency room treatment for pain or narcotic pain medication.

(ECF No. 8-2, PageID.69.) The ALJ continued, giving limited weight to Dr. Spencer's opinion, and stating "additional evidence of record supports a greater degree of limitation as set forth above." (*Id.*, PageID.69–70.) The ALJ finally stated the support for the RFC is found

> in light of the clinical deficits noted in the treatment records and examination reports; his course of treatment; the absence of inpatient hospitalization; the opinions of Dr. Spencer; and the [Plaintiff's] continued activities. The evidence of record indicate that the [Plaintiff] is capable of a limited range of sedentary work. Nothing in the record points to limitations inconsistent with the RFC set forth above.

(*Id.*, PageID.70.) Here the logical bridge of the ALJ's RFC determination is clear. Plaintiff is not disabled by a severe impairment, but severe impairment limits his capabilities according to his residual functional capacity. Nothing in the record suggests Plaintiff is more limited than determined by the ALJ.

This subject matter—Plaintiff's strength, range of motion, and his abilities to sit and stand—and its objective evidence was "not so complex that a lay person could not readily understand the findings and use them to craft a set of appropriate physical restrictions. Findings regarding strength, range of motion, and the ability to ambulate are relatively straightforward and don't require expert medical interpretation." *Olshelfske v. Comm'r of*

35

*Soc. Sec.*, 2019 WL 4892422, at *7 (E.D. Mich. 2019), *rep. & rec. adopted*, 2019 WL 4509128 (E.D. Mich. 2019).

Lastly, Plaintiff's argument, here, fundamentally is that there was no logical connection, sufficient for review, between the medical record and the RFC. However, Plaintiff, here at step four of the five-step evaluation process, retains the burden of proving the severity of his impairments. The logical connection needed for review has been addressed above, and to the extent that Plaintiff is seeking the ALJ prove the RFC, that argument has been rejected by *Her v. Comm'r of Soc Sec*, 203 F.3d 388, 392 ("we reject the argument that if Residual Functional Capacity is not proven by the [Plaintiff] before step five, the burden of proving it shifts to the Commissioner.") Plaintiff, here, does not provide any evidence—short of arguing he is presumptively disabled by meeting or medically equaling a listed impairment in step three—to prove the RFC is inappropriate for analysis at steps four and five. *See Turvey v. Comm'r of Soc. Sec.*, 2013 WL 3271194, at *5 (E.D. Mich. 2013) ("Plaintiff does not specify any additional work-related functional limitations the ALJ should have, but did not, include in the RFC assessment resulting from his pain or mental impairments."). *See also Shoops v. Comm'r of Soc. Sec.*, 2019 WL 2051902, at *5 (E.D. Mich. 2019) ("it is Plaintiff's burden to prove that he has a more restrictive RFC than that assessed by the ALJ.") *rep. & rec. adopted as modified*, 2019 WL 1417164 (E.D. Mich. 2019). Plaintiff has not met his burden.

### H.    Conclusion

For these reasons, I would conclude that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's Motion, (ECF

No. 10), **GRANTING** the Commissioner's Motion, (ECF No. 12), and **AFFIRMING** the Commissioner's final decision denying benefits.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  September 1, 2020                    S/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge